Brown v Brookdale Univ. Med. Ctr. (2024 NY Slip Op 50459(U))

[*1]

Brown v Brookdale Univ. Med. Ctr.

2024 NY Slip Op 50459(U)

Decided on April 23, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 23, 2024
Supreme Court, Kings County

Sharon Brown, as Administrator of the 
 Estate of DORA LEE HEAD (Deceased), Plaintiff,

against
Brookdale University Medical Center, FEKADE TEFERA, M.D., DITMAS PARK REHABILITATION AND CARE CENTER, LLC, VOHRA HEALTH SERVICES, P.A. and "JOHN/JANE DOE" BERKOWITZ, M.D., first name being fictitious as first name is unknown, Defendants.

Index No.16307/2012

Plaintiff
Edward Spark, Esq. (information@weiserlaw.com)
Weiser & Associates, LLP
215 Lexington Avenue, 18th Floor
New York, NY 10016
212-213-3111
Defendant Brookdale University Medical Center
John Gizunterman, Esq. (jgizunterman@fkblaw.com)
Furman Kornfeld & Brennan LLP
88 Pine Street, 32nd Floor
New York, NY 10005
212-867-4100
Defendant Fekade Tefera, M.D.
[No representation recorded]
Defendant Ditmas Park Rehabilitation and Care Center, LLC
Caitlin Robin, Esq. (caitlin@robinandassociates.com)
Caitlin Robin & Associates, PLLC
30 Broad Street, Suite 702
New York, NY 10004
646-524-6026
Defendant Vohra Health Services, P.A.
[No representation recorded] 
 
Defendant "John/Jane Doe" Berkowitz, M.D.
[No representation recorded]

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 2-29
Defendant Brookdale University Medical Center ("Brookdale Hospital") moves (Seq. No. 10 & 11 in UCMS; Seq. No. 11 in NYSCEF[FN1]
) for an Order, pursuant to CPLR 3212, granting summary judgment in favor of movant. Plaintiff opposes the motion.
Dora Lee Head ("Decedent") commenced this action on August 8, 2012, asserting claims of medical malpractice against Brookdale Hospital and other medical providers, in connection to the monitoring, treatment, and prevention of pressure ulcers. The decedent passed away on September 12, 2014, and Sharon Brown was subsequently substituted as plaintiff-administrator.
Decedent was admitted to Brookdale Hospital from February 23, 2010 to March 5, 2010. At the time of her admission, she was 71 years old and presented with slurred speech, left side weakness, and loss of appetite. She was anemic and had low albumin levels on admission. She also had a history of strokes, diabetes, hypertension, cardiovascular surgery, and Alzheimer's dementia. She was initially transferred to the stroke unit, then moved to a bed on the regular medicine floor on February 26 after developing a fever, acute renal failure, and testing positive for E. coli and urosepsis.
During her admission, Decedent developed a Stage II pressure ulcer, which was first observed on February 28 in the sacral region between the buttocks, measuring 8x15 cm. The nursing records document the stage, size, and location of the pressure ulcer, and that it was treated with zinc oxide ointment at regular intervals. On March 3, the ulcer was recorded as having open, pink wound areas, measuring 6x5 cm on the left buttocks and 6x4 cm on the right buttocks. On March 5, the date of her discharge, the ulcer remained at Stage II, measuring 12x9 [*2]cm across the buttocks. She was then discharged to Ditmas Park Rehabilitation Center, another defendant in this action.
Plaintiff alleges that Brookdale Hospital's departures from the standard of care in their risk assessment, prevention procedures, and treatment of pressure ulcers proximately caused the development and worsening of Decedent's sacral ulcer.
"In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries" (Hutchinson v. New York City Health and Hosps. Corp., 172 AD3d 1037, 1039 [2d Dept. 2019], quoting Stukas). "Thus, in moving for summary judgment, a physician defendant must establish, prima facie, 'either that there was no departure or that any departure was not a proximate cause of the plaintiff's injuries'" (id., quoting Lesniak v. Stockholm Obstetrics & Gynecological Servs., P.C., 132 AD3d 959, 960 [2d Dept. 2015]). "In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden" (Bowe v Brooklyn United Methodist Church Home, 150 AD3d 1067, 1068 [2d Dept 2017])." "Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotes and citations omitted]).
An expert opinion need not be provided by a specialist, but the expert must demonstrate that they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (DiLorenzo v Zaso, 148 AD3d 1111, 1112-1113 [2d Dept 2017]). For example, a medical doctor of plastic surgery and wound care may nonetheless lay a proper foundation of experience and education to opine on the prevention and treatment of pressure ulcers (see Cerrone v North Shore-Long Is. Jewish Health Sys, Inc., 197 AD3d 449, 452 [2d Dept 2021]).
In support of this motion, Brookdale Hospital submits an expert affirmation from Lawrence Diamond, M.D. ("Dr. Diamond"), a licensed New York physician who is board certified in family practice with a certificate of added qualifications in geriatric medicine. He affirms that he has treated thousands of elderly and immobile patients with multiple comorbidities including pressure ulcers, diabetes, cardiovascular complications, hypertension, and strokes. He has therefore established the relevant qualifications to opine on the prevention and treatment of pressure ulcers in elderly and immobile patients, as well as the way such ulcers interact with the other health conditions present in Decedent.
Based upon his review of the records and relevant expertise, Dr. Diamond opines that there were no departures from accepted medical standards in the treatment and care of Decedent while she was a patient at Brookdale Hospital. Dr. Diamond notes that from February 24 through the rest of Decedent's admission, there was a standing order to "elevate head of bed to 30 degrees" (Exhibit Q, at 122-124). Dr. Diamond notes that this elevation of 30-45 degrees (also known as a semi-fowler position) was due to her risk factors for aspiration, which include "altered mental status, neurologic disorders, seizure activity, dementia, and stroke." According to Dr. Diamond, the semi-fowler position allows for limited turning to the left and right, but it does not allow lateral positioning to relieve pressure from the hips and buttocks. As a result, this position will naturally increase weight on the pelvic region and cause "a decrease in skin blood [*3]flow and eventual tissue breakdown in the form of ulcers." The elevated position also carries "an increased risk of skin tearing due to friction" when a patient slides further down the bed and must be repositioned to sit up, and the longer a patient is in the semi-fowler position, it "significantly increases the risk of developing skin breakdown and ulcers/skin damage to the gluteal, sacral, and coccygeal areas." Dr. Diamond opines that despite these risks, Decedent's other health issues required her to be placed in such a position, as it "increases lung volume and ventilation, allows the work of breathing to relatively decrease, and promotes lung dilation," clearing the airway of patients who are in danger of aspiration. Dr. Diamond opines based on the records that Decedent was "critically ill" during her admission with multiple comorbidities including a recent stroke, acute renal failure, uncontrolled diabetes, and dementia. He opines that these conditions increased her aspiration risk, requiring her to be placed in a semi-fowler position, and made a breakdown of skin in the buttocks region "inevitable" due to friction and pressure, despite the proper care rendered by the hospital.
Dr. Diamond opines that Brookdale Hospital acted in accordance with good and accepted medical standards in their treatment and care of Decedent prior to the discovery of her pressure ulcer. Specifically, the hospital records show that a standard "pressure ulcer prevention plan" was initiated for Decedent upon admission (Exhibit Q, at 93). Michelle Maxwell ("RN Maxwell"), a Brookdale Hospital nurse involved in Decedent's care, testified that where no other treatment is specified or ordered, a patient with mobility issues would be turned every two hours according to the standard plan of care (RN Maxwell deposition tr, at 57, 72). The nursing flowsheets reference these pressure ulcer guidelines, which were checked "Y" each day and evening (id., at 122-124). The patient was also assessed for nutritional risk and placed on a nutrition plan. Dr. Diamond opines that the nurses and specialists at Brookdale Hospital "rendered proper skin care" and "all proper preventative measures" including a pressure relieving mattress, regular turning and positioning, and linen changes, as recorded in nursing flowsheets. Notwithstanding these preventative measures discussed the expert, he opines that the development of a sacral pressure ulcer was "unavoidable" in light of her elevated position and comorbidities.
Decedent was discovered to have a Stage II pressure ulcer on February 28, about four or five days into her admission. Dr. Diamond opines that the Brookdale Hospital staff continued to properly treat Decedent by regularly applying zinc oxide "to maintain a moist wound environment with the goal of healing or halting the progression of the sacral ulcer." The staff monitored and recorded the size and excoriated areas of the wounds, and the nursing flowsheets and notes demonstrate that treatment and preventative measures were continued. Dr. Diamond opines that this treatment for a Stage II pressure ulcer was appropriate and in accordance with good and accepted medical standards.
At the time of her discharge on March 5, 2010, Dr. Diamond opines that Decedent was "medically stable" for transfer to the rehabilitation facility. The sacral ulcer remained at Stage II, but no additional pressure ulcers had formed. The ulcer was recorded as appearing dry and yellowish brown, measuring 12x9 cm across the buttocks cheeks, and the surrounding area was intact. Dr. Diamond opines that although the ulcer did not significantly improve during her admission, the "relatively minor difference in size of the ulcer upon discovery and at the time of discharge" evinces that the ulcer did not significantly worsen at Brookdale Hospital after it was identified, nor did it become infected.
According to Dr. Diamond, the pressure ulcer's inability to fully heal between its [*4]discovery and Decedent's discharge was "clinically inevitable," because her elevated semi-fowler position caused "continual and inescapable pressure from weight on the sacral spine." Additionally, Decedent's documented nutritional deficit, low albumin levels, and low red blood count contributed to her skin's inability to heal, and therefore Dr. Diamond opines that her sacral ulcer was "only a byproduct of multiple comorbidities." As such, he opines that Decedent's injuries and death subsequent to her discharge were not proximately caused by any act or omission of Brookdale Hospital.
Based on these submissions, Brookdale Hospital has made a prima facie showing of entitlement to summary judgment. Movant's expert establishes that the preventative measures and treatment rendered to Decedent during her admission were within good and accepted medical standards, and the injuries claimed by Decedent were not caused by any departures from the standard of care.
In opposition, Plaintiff submits an expert affidavit from Donna McCabe ("RN McCabe"), a registered nurse with certifications in gerontological nursing and mental health nursing.
It is well-established that a nurse generally lacks the qualifications to render an opinion as to the standard of care in a medical malpractice claim (see Boltyansky v New York Community Hosp., 175 AD3d 1478, 1479 [2d Dept 2019]). In fact, in a case directly involving treatment of a sacral pressure ulcer which progressed from Stage III to Stage IV, the Second Department held that a registered nurse "was not a medical doctor and lacked the qualifications to render a medical opinion as to the relevant standard of care, and whether the defendants deviated from such standard" (Novick v South Nassau Communities Hosp., 136 AD3d 999, 1001 [2d Dept 2016]), citing Elliot v Long Is. Home, Ltd., 12 AD3d 481, 482 [2d Dept 2004]).
The Second Department has also held that even in limited situations where a registered nurse is qualified to render an opinion on issues of nursing expertise — for example, opining that administering a drug without a physician's order was a departure from acceptable standards of nursing care — they are not qualified to opine on whether those departures were a substantial factor in causing the patient's injuries (Zak v Brookhaven Mem. Hosp. Med. Ctr., 54 AD3d 852, 853 [2d Dept 2008]). When addressing pressure ulcers specifically, a nurse lacks the qualifications to refute a doctor's opinion that said ulcer was an "inevitable" result of the patient's other health conditions (Novick, at 1001).
Here, even if RN McCabe demonstrated appropriate qualifications, her affidavit is replete with conclusory opinions regarding the standard of care for pressure ulcer prevention. She opines without detail that the nursing flowsheets contain "sparse and/or improper documentation" of whether the patient was actually turned and repositioned every two hours, "as required by the bare minimum standard for prevention of pressure ulcers." However, Plaintiff's expert does not refute that a two-hour turning protocol was the standard prevention guideline referenced in RN Maxwell's testimony and Brookdale Hospital's records.
RN McCabe also opines that Decedent's semi-fowler position should have led to "further nursing assessment (repeated Braden Scale Assessment) and mitigation of the increased pressure ulcer risk through increased turning and positioning." To the extent that RN McCabe might be qualified to opine on the nurses' risk assessments, her opinion is still conclusory and unsupported by the evidence. She does not address the fact Decedent's risk of pressure ulcers was reassessed on February 28 (moderate risk — 13), March 1 (moderate risk — 13), and March 3 (high risk — 11), nor does she provide any substantive opinion on the initial assessment or reassessments (Exhibit Q, at 117-118).
The Brookdale Hospital nurse involved in Decedent's treatment testified that specific alterations of the hospital's guidelines for turning and repositioning would be ordered by a physician (RN Maxwell tr, at 57). She also testified that once a pressure ulcer has been identified, the hospital's standard practice is to "notify the doctor and the doctor would review, evaluate, assess the pressure ulcer with a treatment plan . . . [T]he doctor would write the treatment and the nurse would implement the treatment" (id., at 33). Plaintiff's expert is not qualified to opine vaguely on the "increased turning and positioning" measures which allegedly should have been instituted by the attending physician, because such measures were not in the nursing staff's control nor the witness's field of expertise.
RN McCabe alleges specifically that "the use of zinc oxide to treat a stage 2 pressure ulcer was not the standard of care," and saline and hydrogel should have been used to cleanse the wound instead. As a nurse, she again lacks the qualification of a medical doctor to render an expert opinion on this treatment. RN Maxwell testified that the zinc oxide ointment applied to Decedent's ulcer was prescribed by a doctor, and she reiterated that any change in treatment once the Stage II ulcer was discovered was in control of the attending physician, not the nursing staff (id., at 81-82). Plaintiff's nursing expert therefore lacks any demonstrated experience or knowledge to opine as to proper treatment of a Stage II ulcer or the hospital's alleged departure.
Furthermore, the Second Department's precedent in Zak is clear that an "expert" who is not a medical doctor cannot raise a triable issue of fact as to causation. Thus, even if this Court were to accept RN McCabe's opinions on any of the alleged departures from the nursing staff in pressure ulcer prevention, assessment, documentation, and/or treatment, her opinions have no probative value as to whether those departures were a substantial factor in causing Decedent's injuries. Plaintiff raises no evidence in the form of a qualified expert affirmation to counter Dr. Diamond's opinion that the Decedent was "critically ill," that Decedent's pressure ulcer was "inevitable," and that the development of the ulcer and its difficulty healing were the result of Decedent's underlying conditions and not any departures from the hospital staff.
For these reasons, Plaintiff has not raised any triable issues of fact sufficient to defeat Brookdale Hospital's prima facie entitlement to summary judgment.
Accordingly, it is hereby:
ORDERED that Defendant Brookdale University Medical Center's motion (Seq. No. 10 & 11 in UCMS; Seq. No. 11 in NYSCEF) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing Plaintiff's complaint as against the movant, is GRANTED.
The Clerk is directed to enter judgment in favor of Brookdale University Medical Center.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.

Footnotes

Footnote 1: A paper copy of the instant motion was numbered "Seq. No. 10" in court records before the case was converted to e-filing. After conversion to NYSCEF, the notice of motion and supporting papers were re-filed electronically as "Seq. No. 11." Opposition and reply papers were filed in NYSCEF.